UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

Case No. 2:18-cr-20450-2

HONORABLE STEPHEN J. MURPHY, III

v.

DAVID ALLEN JOHNSON,

        Defendant.

                              /

**OPINION AND ORDER
<u>DENYING MOTION TO SUPPRESS [99]</u>**

The Government charged Defendant David Allen Johnson in a five-count indictment with conspiracy to commit bank robbery under 18 U.S.C. § 371, attempted bank robbery and completed bank robbery plus aiding and abetting under §§ 2, 2113(a), and two counts of using a firearm during a crime of violence and aiding and abetting under §§ 2, 924(c). ECF 29, PgID 42–47. Defendant's two co-Defendants, Robert James Gunther and Connie Lynn Johnson, have pleaded guilty. ECF 64 (noting that Defendant Gunther pleaded guilty); ECF 106 (Defendant Connie Johnson's Rule 11 Plea Agreement). Defendant moved to suppress certain incriminating statements he made during a police interrogation. ECF 99. The

1

Government opposed the motion. ECF 103.[1] For the reasons below, the Court will deny Defendant's motion to suppress.

## BACKGROUND

In June 2018, Defendant and co-Defendant Gunther attempted to rob a bank in Dearborn Heights, Michigan, and successfully robbed a bank in Taylor, Michigan. ECF 103, PgID 392. Co-Defendant Connie Johnson (Defendant's wife) drove the getaway car. *Id.* All three Defendants were arrested later that day. *Id.* at 393. Two days later, "a Taylor police detective conducted a custodial interview with [Defendant]." *Id.* at 394. Defendant made incriminating statements during the two-hour interview. ECF 99, PgID 368; s*ee* ECF 103-1.[2]

To start the interview, the detective gave Defendant water, coffee, a sandwich, and cigarettes. ECF 103-1 at 12:16:50–17:05.[3] Defendant gestured toward the two-way glass and told the detective to "tell whoever is on the other side they are welcome to join [them]." *Id.* at 12:21:28–31. The detective then sat down to begin the questioning and acknowledged that the interrogation was "not [Defendant's] first rodeo." *Id.* at 12:22:52–55. The detective also asked about Defendant's background,

---

[1] The Court will resolve the motion on the briefs without a hearing because the main issues are "entirely legal in nature"; and an evidentiary hearing is only required "if the motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that [there are] *contested issues of fact.*" *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (emphasis in original) (quotation omitted); *see* E.D. Mich. L. Crim. R. 12.1(a); E.D. Mich. L.R. 7.1(f)(2).
[2] The Government filed a video recording of Defendant's interview in the traditional manner. ECF 103-1 is an index of the exhibits to the Government's response brief that notes that the video was filed in the traditional manner. To cite the video, the Court will cite ECF 103-1 and then cite specifically the relevant time stamps.
[3] All cited times reference the time stamp on the recording.

including his level of education and health history. *Id.* at 12:23:19–24:05. Defendant explained that he had a GED and a culinary arts degree, and at the age of fifty, he has had a history of heart problems and a stroke. *Id.* at 12:23:19–24:05, 12:30:30–38. And for the detective's question about whether he could read and write, Defendant responded, "Yeah, contrary to appearances I can conjugate a verb." *Id.* at 12:24:33–56.

The detective also asked whether Defendant had consumed alcohol or drugs in the last "twenty-four to forty-eight hours." *Id.* at 12:23:30–37. Defendant calmly answered, "I'm not going to answer that." *Id.* Defendant also noted that the last time he had eaten was the day before. *Id.* at 12:24:08–14. Throughout the opening questions, Defendant was calm and responsive. *See id.* at 12:22:52–24:56.

The detective then explained that he had to read Defendant his *Miranda* rights, but Defendant recited them from memory. *Id.* at 12:25:40–26:01. The detective still read Defendant his *Miranda* rights and confirmed after reading each right that Defendant understood the rights. *Id.* at 12:26:01–27:09. The officer also asked whether Defendant had any questions about any of the rights, but Defendant had none. *Id.* Defendant then signed a certificate of notification confirming that he had been read the "Constitutional Rights Statement." *Id.* at 12:27:50–29:20; ECF 103-2, PgID 409. And while he signed his name, he talked to the detective about the day he had his stroke. ECF 103-1 at 12:27:50–29:20.

After Defendant waived his *Miranda* rights, the detective asked Defendant, "Do you want to talk to me about what's going on?" Defendant replied that all he

cared about was his wife, that she was "okay," and that he "want[ed] to see her." *Id.* at 12:29:39–48. The detective noted that it would be difficult for Defendant to see his wife because of a custodial policy that separates the men from the women. *Id.* at 12:30:12–30. But the detective said that if his boss approved the request, then he would not be opposed to letting Defendant see his wife. *Id.* The two then had the following exchange, beginning with the detective:

> Let me do this. I want to take you at your word. If I try to arrange that for you, are you seriously going to want to sit down and talk with me?
>
> I'll sit down and talk to you.
>
> Let me check with my boss; let me see if we can do that for you. If they give me the okay, we'll make it happen.

*Id.* at 12:30:51–31:16 (cleaned up). Defendant's wife was then brought into the interview room. *Id.* at 12:37:27. The two hugged, kissed, caressed, talked to each other, and told one another, "I love you." *Id.* at 12:37:27–40:25.

After they said their goodbyes, Defendant began talking to the detective about why he robbed the bank. *Id.* at 12:42:30–13:05:21. He also asked the detective questions about co-Defendant Gunther and whether he had talked to the police. *Id.* at 12:45:38–46:57. The detective informed Defendant that Gunther did not talk to them. *Id.* at 12:45:52–46:22.

After noting that he would "never see the streets again," Defendant asked whether he would "be arraigned today." *Id.* at 12:57:37–40; 13:06:01; *see also id.* at 13:08:15–18 (Defendant asking about federal or state arraignment). He also talked about the cell conditions that he had experienced the night before and asked whether

he could bathe. *Id.* at 13:06:23–35. Defendant then expressed that he preferred to be prosecuted in the federal system and that he would "give them a conviction." *Id.* at 13:14:33–15:27. He also stated that he "wrote the rules" on how to prolong proceedings, hinting that he would employ such techniques if he were prosecuted by the state instead. *Id.* at 13:15:46. He expressed that he wanted his wife to be federally prosecuted too because it would be safer for her, apparently because of his position in the "Aryan Brotherhood." *Id.* at 13:08:48–59, 13:16:00–16:10.

The two also discussed Defendant's childhood. *Id.* at 13:20:50–24:25. Defendant recalled that he began robbing banks at fourteen, and he detailed facts about his early robberies. *Id.* He also divulged statistics about his history of misconduct while incarcerated, reporting that of "136 [instances], 94 were assaultive." *Id.* at 13:44:46–45:00. Defendant then lamented that his extended family had to deal with his and his wife's arrest during their "oldest granddaughter['s] graduation ceremony [on] Saturday." *Id.* at 13:52:09–19.

At the end, the two stood up, shook hands, and Defendant said, "I appreciate the way you've treated us." *Id.* at 14:12:30–36. In the present motion, Defendant argued that the Court should suppress his statements because they were obtained involuntarily. ECF 99, PgID 368.

**LEGAL STANDARD**

Under the Fifth Amendment, a defendant cannot be "compelled in any criminal case to be a witness against himself." For Fifth Amendment protections to attach, a defendant must make a testimonial statement that is compelled and incriminating.

5

*United States v. Hubbell*, 530 U.S. 27, 34 (2000). But "the Fifth Amendment privilege is not violated by even the most damning admissions" if the admissions were made voluntarily and not coerced. *Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (quotation omitted).

"[T]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (internal quotation marks and quotation omitted). And "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary"; "some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (citations omitted)

The Fifth Amendment's Due Process Clause protects against confessions by a defendant whose "will has been overborne and [whose] capacity for self-determination [is] critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973); *United States v. Wrice*, 954 F.2d 406, 410–11 (6th Cir. 1992). "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citation omitted). A confession is involuntary due to police coercion if: (1) "the police activity was objectively coercive"; (2) "the coercion in question was sufficient to overbear the defendant's will; and"

6

(3) "the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id.* (citation omitted).

## DISCUSSION

To begin, the parties do not dispute that Defendant was subject to a custodial interview when he made the incriminating statements and that the *Miranda* warnings given to Defendant were proper. ECF 99; ECF 103, PgID 394. In a single sentence, Defendant appeared to claim that his *Miranda* waiver was invalid. ECF 99, PgID 374 ("[Defendant] was not clearheaded . . . when signing the *Miranda* waiver."); *see also* ECF 103, PgID 401. But Defendant lodged no argument to support the claim or explain how his *Miranda* waiver was invalid. The Court will therefore deem the argument forfeited. *United States v. Beck*, 842 F. App'x 1010, 1013 (6th Cir. 2021) ("A defendant forfeits an argument by failing to assert it in a timely fashion (i.e., before the district court).").

At any rate, even if Defendant did not feel "clearheaded" while signing the *Miranda* waiver, ECF 99, PgID 374, "the important inquiry is whether the interviewing officers perceived there to be any impairments to a knowing and intelligent waiver, when the totality of the circumstances are considered." *United States v. Hampton*, 572 F. App'x 430, 435 (6th Cir. 2014) (internal quotation marks removed). During the interview, Defendant appeared alert and was responsive. *See generally* ECF 103-1, PgID 408 at 12:21:38–14:12:36. Defendant even cracked jokes, *e.g.*, *id.* at 12:24:37–56, multi-tasked, *id.* at 12:27:50–29:20, and recalled specific facts about his past and about future events during the interview, *id.* at 13:20:50–24:25,

7

13:44:46–45:00, 13:52:09–19. Thus, even if he had not "slept in over twenty-four hours, [Defendant's] coherent and alert nature in responding to police questioning" show that he "made a knowing and intelligent waiver of his *Miranda* rights." *Id.* Put simply, the present case is not the sort in which police engaged in "prolonged questioning," that rendered Defendant incapable "of providing a 'knowing and intelligent' waiver of his Fifth Amendment rights." *Hampton*, 572 F. App'x at 433 (quoting *Newman*, 889 F.2d at 94).

Defendant's remaining arguments bear on the voluntariness of his statements. *See* ECF 99, PgID 368–69, 374; ECF 105, PgID 414–15. He asserted three arguments for why his incriminating statements were involuntary. First, Defendant argued that he "was not clearheaded after smoking crack cocaine prior to his arrest . . . and for the prior six [] days." ECF 99, PgID 368. Second, Defendant added that he "had not slept during the six days prior to his arrest." *Id.* And third, Defendant claimed that he "was improperly induced to make statements because he was promised and allowed to visit, embrace, hug, and kiss his wife during the interview." *Id.* (cleaned up). The Court will address each argument in turn.

The first argument relating to drugs does not show that Defendant made involuntary statements. As Defendant put it, "the interview should have been delayed," because the detectives should have known "that Defendant was using drugs" when he declined to answer whether he had taken drugs in the last two days. ECF 105, PgID 414–15; ECF 103-1 at 12:23:30–37; *see also* ECF 99, PgID 368–69. But Defendant has not shown, and indeed never argued, that *police action* caused his

8

purported lack of clear headedness. *See* ECF 99, PgID 367–69, 374; ECF 105, PgID 414–15. After all, "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary." *Newman*, 889 F.2d at 94.

And, as mentioned, Defendant appeared alert and was responsive throughout the two-hour interview. Besides, he had been in custody for almost two days when he made incriminating statements. *See* ECF 103, PgID 392, 394. Thus, his argument that he had been "smoking crack cocaine *prior* to his arrest," lacks a connection to police conduct and a temporal connection to the incriminating statements. ECF 99, PgID 368 (emphasis added), 376. In fact, Defendant did not argue that he was under the influence of drugs during the interview, only that he "felt high during the interview *because [he] was exhausted from lack of sleep*." ECF 99, PgID 376 (emphasis added). Defendant's drug usage before the arrest does not, therefore, bear on voluntariness. *See Connelly*, 479 U.S. at 170

Defendant's sleep deprivation argument fails for similar reasons. Like the drug usage, Defendant noted that the sleep deprivation occurred on the "days prior to his arrest." ECF 99, PgID 368, 376. And he did not argue that his lack of sleep was due to police misconduct. *See* ECF 99, PgID 367–69, 374; ECF 105, PgID 414–15. To the contrary, the detective allowed Defendant to take several breaks, at Defendant's request, and supplied him with a constant stream of fluids, cigarettes, and food. ECF 103-1 at 12:22:30, 13:05:20–55, 13:12:25–14:31, 13:41:40–42:12. In short, the

9

detective's conduct was respectful and accommodating, not objectively coercive. *See id.* at 14:12:30–36 ("I appreciate the way you've treated us."); *Mahan*, 190 F.3d at 422.

Defendant's last argument is misleading and fails to show involuntariness. In Defendant's affidavit, he claimed that the detective "promised me I could see my wife person-to-person in the jail[] if I interviewed." ECF 99, PgID 377; *see* ECF 103-1 at 12:30:51–31:16. The promise, Defendant argued, was "law enforcement pressure[] [on] Defendant to confess." *Id.* at 374. But the interview recording shows a different story.

To start, *Defendant* prompted the conversation about seeing his wife. ECF 103-1 at 12:29:39–48. The detective then explained that the in-person meeting would violate the jail's gender separation policy. *Id.* at 12:30:12–30. Thus, the detectives did not attempt to "overc[o]me [his] will and free choice" by considering Defendant's own request. ECF 99, PgID 377; *see Mahan*, 190 F.3d at 422. What is more, the detective told Defendant during the interview that co-Defendant Gunther had refused to speak to the police. ECF 103-1 at 12:45:52–46:22. Thus, unlike other defendants who believed that their accomplices had incriminated them, *see, e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969), Defendant knew that Gunther had not yet confessed. Consider too that Defendant's incriminating statements came *after* he saw his wife. ECF 103-1 at 12:30:51–31:16, 12:37:27–13:05:21. It follows that he could have

10

withdrawn his promise to talk to the detective after his wife left; the Government's bargaining chip had been spent.[4]

Last, the Sixth Circuit has outlined several factors that courts must consider when determining whether psychological tactics employed by police are unconstitutional. *Mahan*, 190 F.3d at 422. "Relevant factors" for "the totality of the circumstances concerning whether a defendant's will was overborne . . . include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment," like food or sleep deprivation. *Id.* at 422–23 (internal quotation marks and quotation removed).

Defendant was fifty years old, ECF 103-1 at 12:30:30–38 and was so experienced with the criminal justice system such that he claimed to have written the rules on tactics that delay prosecution, *id.* at 13:15:46; *see also id.* at 12:21:28–31, 12:22:52–55 ("This is not your first rodeo."). He also had a GED and a culinary arts degree, *id.* at 12:23:19–24:05, and he cogently recalled statistics and facts during the interview, *id.* at 13:20:50–24:25, 13:44:46–45:00, 13:52:09–19. And not only was Defendant informed of his constitutional rights, but he recited the rights from memory before the detective *Mirandized* him, *id.* at 12:25:40–26:01. Defendant also

---

[4] While the Court does not and could not make or administer law enforcement policy, the Court does highlight the unanticipated and inverse consequences of unusual law enforcement practices, even well-intended ones, that seek to provide special accommodations for detainees. Here, the detective apparently attempted to act in a spirit of generosity toward a detainee and the supposedly generous act then led to the filing of a suppression motion that required significant court resources to resolve.

11

did not argue that the detective ever physically punished him by withholding food or forcing sleep deprivation. *See* ECF 99; 105. To be sure, the recording shows that the detective offered him food, bottomless coffee and water, and promised to look into finding him a blanket for that night. ECF 103-1 at 12:16:50–17:05, 14:08:37–09:06. He even, at Defendant's request, arranged an unorthodox visit with Defendant's wife. In sum, every "relevant factor[]" favors a finding of voluntary incrimination. *Mahan*, 190 F.3d at 422–23.

All told, the totality of the circumstances here show that Defendant's statements were "the product of free and rational choice rather than any police coercion." *Id.* at 423. Defendant therefore voluntarily made the incriminating statements. Accordingly, the Court will deny the motion to suppress.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the motion to suppress [99] is **DENIED**.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: May 10, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 10, 2022, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager